UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| STEPHEN PAPOL,<br><br>Plaintiff,<br><br>v.<br><br>MIDAS RESOURCES, INC.,<br><br>Defendant. | Civil No. 05-599 (PJS/JJG)<br><br>MEMORANDUM OPINION AND<br>ORDER ON DEFENDANT'S MOTION<br>FOR SUMMARY JUDGMENT |

Thomas R. Sheran, MOSS & BARNETT, PA, 90 South Seventh Street, Suite 4800, Minneapolis, MN 55402, for plaintiff.

Richard L. Leighton, LEIGHTON HETLAND PLLP, 222 South Ninth Street, Suite 2960, Minneapolis, MN 55402-3302, for defendant.

This matter is before the Court on defendant Midas Resources, Inc.'s ("Midas's") motion for summary judgment. For the reasons set forth below, the motion is granted with respect to plaintiff's claim of intentional infliction of emotional distress and denied in all other respects.

BACKGROUND

Midas, a Minnesota corporation with its principal place of business in Burnsville, Minnesota, is engaged in the business of procuring precious metals, with an emphasis on gold coins. Anderson Aff. ¶¶ 5-6, Civ. No. 04CV5703 (JBW) (E.D.N.Y. Dec. 31, 2004).

Stephen Papol, a resident of New York, purchased nearly $1 million worth of gold coins through Midas in late 2003. The dispute in this case concerns the substantial losses that Papol suffered on his investment.

Papol was initially referred to Midas by a friend, Cesar Alvarez. Leighton Suppl. Decl., Ex. P (Audio CD), Track Two. The parties dispute why Papol was interested in Midas. Midas alleges that Papol was going through a contentious divorce and that Papol contacted Midas because he was seeking to hide assets from his estranged spouse, her attorney, and the divorce court. Leighton Decl, Exs. I, J. Papol denies that he was trying to hide assets. Rather, Papol alleges that he sold his house during the divorce proceedings, and he was simply looking for a way to invest the proceeds until his divorce was final. Papol Aff. ¶¶ 6-8.

Whatever the reason, Papol spoke with Midas representative Jerald Carlson ("Carlson") in late 2003. Carlson's business card stated that he was a "Monetary Specialist," Sheran Aff., Ex. A, which, Papol claims, led Papol to believe that Carlson would be able to give him investment advice. Papol says that he explained to Carlson that he was in the process of divorcing his wife and that he had funds to invest from the sale of his home, pending the resolution of the divorce proceedings. Papol Aff. ¶¶ 4-8. He further advised Carlson that he needed liquidity in order to meet any financial obligations that might arise relating to his divorce. *Id.* at ¶ 8. According to Papol, Carlson then recommended that Papol invest in gold coins. *Id.* at ¶ 4. On November 24,

2003, Papol transferred approximately $814,000[1] to an account that Midas set up on his behalf. Papol claims that he authorized Midas to act as his agent in investing this money – and, in particular, in selecting the type, quantity, and price of gold coins. *Id.* at ¶¶ 4, 8.

On November 25, 2003, Midas purchased $455,700 in gold coins on Papol's behalf. *Id.* ¶ 8. Pursuant to Papol's instructions, Midas retained possession of the coins. Papol alleges that, soon after Midas made this purchase, Carlson informed him that his investment had already increased in value by $50,000. *Id.* at ¶ 9. Papol alleges that this induced him to enter into two additional transactions in December 2003. *Id.* Ultimately, Papol bought $986,701 worth of coins. Leighton Decl., Ex. A.

On January 30, 2004, Papol settled his divorce case and agreed to pay his ex-wife $300,000 within 21 days. Papol Aff. ¶ 11. Papol then contacted Midas to request that it sell some of his gold coins to raise the necessary funds. *Id.* Carlson informed Papol that, if Papol were to sell all of his gold coins, he would receive over $400,000 less than he paid for them. *Id.* Midas attributed this "loss" to normal dealer mark-ups and market fluctuations. Papol suspects something less innocent. He now contends that at least some of the loss reflected "hidden" and unreasonable profits taken by Midas. Pl.'s Memo. in Opp. to Summ. J. 2.

---

[1]Papol's affidavit gives the figure as "$814,89.77." It is clear, however, that the amount was in excess of $455,700, which the parties agree is the price Papol paid for the first set of gold coins on November 25, 2003. Thus, the figure in Papol's affidavit is missing a digit and does not merely have a misplaced comma.

On February 5, Papol spoke with Carlson and John Picciano ("Picciano"), the General Manager of Midas.  Leighton Suppl. Decl., Ex. P, Track One.  Papol initially indicated that he wanted Midas to keep the gold and refund all of his money.  *Id.*  Picciano responded that Midas would liquidate the gold coins or send them to Papol, but Picciano refused to refund Papol's money.  *Id.*  Picciano also recommended that Papol hold onto the gold coins until market conditions were better.  *Id.*  Papol then sent a letter to Picciano, dated the same day, asking him to ship the gold to Papol's attorney via overnight delivery service.  Sheran Aff., Ex. D.  Midas shipped the gold in separate insured shipments, with the last shipment arriving on February 25, 2004.  Sheran Aff., Ex. F.

Papol decided to report Midas's activities to the police.  On February 17, 2004, Papol spoke by phone with Detective Mike Tackaberry ("Tackaberry") of the Burnsville Police Department.  Leighton Suppl. Decl., Ex. P, Track Two.  Tackaberry tape recorded that conversation, including the following statements of Papol:

> Back when I was going through a divorce, okay, I sold my house, okay, and I got referred to these people to buy the coins from them.  They had told me that they were going to be able to lose this money, and you know, buy this private gold, and it was untraceable, so whatever, um, money I had to hide or anything, they can do it, because there's no documentation of this private gold.  Um, as it turned out, I purchased this, uh, gold from them.
>
> \*          \*          \*
>
> I spoke with Jerry Carlson on the phone a number of times before I made this.  I was a little skeptical about it.  He sort of like, kind of ah, reassured me, and told me what a great investment it was, how much money I was gonna be making on it, and right away I was gonna be making money as

> soon as I purchased it. And, um, it was untraceable, they're telling me, so I had nothing to worry about. Even if they wanted to come look for the money, they would never, if, you know, if the courts would come look for the money they would never find the money. Still kind of skeptical about the whole thing and 'cause I really, you know, I'm in New York and they're all the way in Minnesota.

*Id.*[2]

Papol filed a complaint against Midas in New York state court in November 2004, alleging breach of contract, breach of fiduciary duty, fraud, and intentional infliction of emotional distress. Midas removed the case to federal court and successfully moved for a transfer to the District of Minnesota. Midas now moves for summary judgment on all of Papol's claims.

## ANALYSIS

A.    Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a court is required to view the facts in the light most favorable to the

---

[2] Midas has provided an unofficial transcript of this conversation in addition to the audio recording. Leighton Suppl. Decl., Ex. J. A comparison of the two reveals various minor differences; accordingly, the Court has reproduced the audio version as accurately as possible.

nonmoving party. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir. 1987).

B.  Midas's Affirmative Defenses

    1.  *In Pari Delicto*

Midas argues that all of Papol's claims are barred by the doctrine of *in pari delicto* — a doctrine that, roughly speaking, allows a court to refuse to grant relief when two parties have engaged in wrongful conduct and one of them sues the other. *See State v. AAMCO Automatic Transmissions, Inc.*, 199 N.W.2d 444, 448 (Minn. 1972) (stating that *in pari delicto* "is based upon judicial reluctance to intervene in disputes between parties who are both wrongdoers in equal fault."). According to Midas, Papol is claiming that Midas and he entered into a scheme to hide assets from Papol's ex-wife. Midas denies that it intentionally entered such a scheme, but acknowledges that the Court must assume that Papol's allegations are true for purposes of summary judgement. Assuming, then, that Midas and Papol conspired to hide assets from Papol's wife, this Court should declare a pox on both their houses, and refuse to afford relief to Papol under the *in pari delicto* doctrine. That, at least, is Midas's argument.

The problem is that Midas mischaracterizes Papol's allegations. Papol does not, in fact, contend that he conspired with Midas to hide assets from his ex-wife. To the contrary, Papol denies that he ever intended to hide money. According to Papol, the only person who ever raised the topic of hiding assets was Carlson.

Papol's version of events is not easy to reconcile with the statements that he made to Tackaberry (quoted above). Tackaberry clearly understood Papol to be admitting that he was trying to hide assets from his wife, *see* Leighton Decl., Ex. I, and that seems to be the most natural inference to be drawn from Papol's words. It is, however, not the only reasonable inference. As Papol points out, every mention of a plan to hide his assets is couched in terms of what Midas told him. The Court is unable to say that a reasonable juror must find that Papol was trying to hide his assets.

Thus, to the extent that Midas seeks dismissal of Papol's claims based on *in pari delicto*, the motion is denied. When Midas denies that it did anything wrong, and Papol denies that he did anything wrong, the Court cannot dismiss claims on motion for summary judgment on the grounds that both parties did something wrong.

2. Unclean Hands

Midas also contends that Papol's alleged wrongdoing in attempting to hide his assets bars Papol from equitable relief under the doctrine of unclean hands. *See Hruska v. Chandler Assocs., Inc.*, 372 N.W.2d 709, 715 (Minn. 1985) ("We subscribe to the maxim that 'he who seeks equity must do equity, and he who comes into equity must come with clean hands'" (quoting *Johnson v. Freberg*, 228 N.W. 159, 160 (Minn. 1929)). As noted, though, there is a genuine issue as to whether Papol was attempting to hide assets from his ex-wife when he purchased gold coins through Midas. Midas's motion for summary judgment on the basis of unclean hands is therefore denied.

C. Papol's Claims

1.     Breach of Contract (Count 7)

In Count 7 of his Complaint, Papol alleges that he had an agreement with Midas concerning the investment of his money and that Midas breached the agreement. Pl.'s Compl. ¶¶ 97-104. At oral argument, Midas conceded that its only argument in support of summary judgment on this claim is *in pari delicto*. As the Court declines to grant summary judgment on the basis of that doctrine, Midas's motion for summary judgment with respect to Count 7 is denied. Midas will, of course, be permitted to attempt to establish its defenses of *in pari delicto* and unclean hands at trial.

2.     Breach of Fiduciary Duty Claims (Counts 1, 3, 4, 5, 6)

Papol alleges that Midas intentionally breached its fiduciary duties to him by misrepresenting the value of the coins and skimming secret profits from the transactions, and negligently breached its fiduciary duties to him by acquiring coins that were not worth what he paid and by making negligent misrepresentations concerning the value of the coins. It is a close question whether a reasonable juror could find that a fiduciary relationship existed between Midas and Papol, even accepting Papol's version of the facts. In general, ordinary contractual relationships – ordinary buy-sell transactions – do not give rise to fiduciary duties. *See Midland Nat'l Bank v. Perranoski*, 299 N.W.2d 404, 413 (Minn. 1980); *Sec. Sav. Bank v. Green Tree Acceptance, Inc.*, 739 F. Supp. 1342, 1350 (D. Minn. 1990); *In re Morken*, 182 B.R. 1007, 1022 (Bankr. D. Minn. 1995). Something more must be established, lest every breach-of-contract action be converted into a breach-of-fiduciary-duty action.

*Kennedy v. Flo-Tronics, Inc.*, 143 N.W.2d 827 (Minn. 1966) is instructive. Kennedy first met Nelson when then-Private Kennedy served in the Army under then-Colonel Nelson. *Id.* at 828.  Over a period of six years, the two men conducted business together and occasionally socialized. *Id.* at 829-30.  Nelson eventually proposed that Kennedy merge his business with a company that had recently acquired Nelson's business, assuring him that the merger would provide financial security and an education for Kennedy's children. *Id.* at 330.  Kennedy stated that he did not want to gamble, and testified that Nelson, a vice president of the defendant company, insisted that there was no gamble involved. *Id.*  In reversing a judgment for Kennedy, the Minnesota Supreme Court held that these circumstances did not justify a conclusion that there was a "true relationship of trust and confidence" between the parties – the type of relationship that might give rise to fiduciary obligations. *Id.* at 831.

In comparison to *Kennedy*, the evidence of a relationship of "trust and confidence" between Papol and Midas is much weaker.  Nevertheless, the Court will not dismiss Papol's breach-of-fiduciary-duty claims at this time because Papol has submitted some evidence that Carlson went beyond agreeing to sell him gold coins, and instead agreed to act more broadly as Papol's agent.  An agency relationship in which one party agrees to act on another's behalf and subject to his control is a fiduciary relationship. *A. Gay Jenson Farms Co. v. Cargill, Inc.*, 309 N.W.2d 285, 290 (Minn. 1981); *PMH Props. v. Nichols*, 263 N.W.2d 799, 801 (Minn. 1978).  The existence of an agency relationship in particular, and a fiduciary relationship in general, are generally questions of fact. *Vacura*

*v. Haar's Equip., Inc.*, 364 N.W.2d 387, 391 (Minn. 1985) (agency relationship); *Toombs v. Daniels*, 361 N.W.2d 801, 809 (Minn. 1985) (fiduciary relationship).

Accepting Papol's allegations as true, Papol did more than simply contact Midas and negotiate the sale of gold coins. Rather, Papol turned a substantial sum of money over to Midas, informed Carlson (a "Monetary Specialist") of his financial goals and lack of sophistication regarding investing in precious metals, and entrusted Carlson to invest his money appropriately. Carlson, in turn, did more than simply sell coins to Papol. Rather, Carlson assured Papol that Carlson would monitor the market on Papol's behalf and give Papol advice about getting in and out of the market. In light of this evidence, the Court is unable to rule that no agency relationship existed as a matter of law. Midas's motion for summary judgment on Papol's fiduciary duty claims is therefore denied.

      3.      Fraudulent Misrepresentation (Count 2)

The elements of a fraudulent misrepresentation claim are: (1) a false representation of a past or existing material fact; (2) knowledge or reckless disregard of the falsity; (3) intent to induce reliance; (4) reliance; and (5) resulting damages. *See Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986).

Papol alleges that Carlson's statement that he had made $50,000 on his first purchase of coins induced him to invest additional money through Midas to his detriment.[3] Papol has cited expert testimony that Carlson's statement could not have been

---

[3] At oral argument, Papol's counsel indicated that his fraud claim also encompasses Midas's alleged failure to disclose Midas's profits on the transactions. It is unclear how this

true – that Papol could not possibly have earned $50,000 on his investment, as Carlson asserted. Parrella Aff., Ex. A; Leighton Suppl. Decl., Ex. N. Papol's evidence regarding this claim is not abundant, but it is enough to survive summary judgment, especially given that Midas has done little to challenge Papol's prima facie case. Instead, Midas has focused its attention on the question of remedies – and, in particular, on its argument that Papol cannot seek equitable relief on this or other claims because he has an adequate remedy at law. Midas is correct that, as a general matter, an adequate remedy at law precludes equitable relief. *See, e.g., ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 305 (Minn. 1996). But the Court's consideration of what remedies might be available to Papol will benefit considerably from the record established at trial. The Court will therefore defer ruling on any question regarding remedies until trial.

    4.    Intentional Infliction of Emotional Distress (Count 8)

To establish a claim of intentional infliction of emotional distress, Papol must establish that (1) Midas's conduct was extreme and outrageous; (2) Midas's conduct was intentional or reckless; (3) Midas's conduct caused Papol to suffer emotional distress; and (4) Papol's emotional distress was severe. *See Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 864 (Minn. 2003). Conduct is extreme and outrageous "when it is 'so atrocious that

---

claim differs from his breach of fiduciary duty claims. *See Midland Nat'l Bank*, 299 N.W.2d at 413 (stating the "general rule" that, absent a fiduciary relationship, parties to a transaction have no duty to disclose material facts to each other). Nor does it appear that Papol has pled this fraud claim with particularity. *See* Fed. R. Civ. P. 9(b). As the parties did not brief this claim and only lightly touched on it at oral argument, however, the Court will not address it at this time.

it passes the boundaries of decency and is utterly intolerable to the civilized community.'" *Id.* at 865 (quoting *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 439 (Minn. 1983)). Merely reciting the required elements suffices to demonstrate that Papol cannot maintain a claim for intentional infliction of emotional distress under the facts of this case. While Midas's conduct, as alleged by Papol, may have been unsavory, it simply cannot be described as "atrocious" or "utterly intolerable to the civilized community." Moreover, Papol points to no evidence that he suffered emotional distress or that any emotional distress he suffered was severe. Accordingly, Midas's motion for summary judgment on Papol's claim for intentional infliction of emotional distress is granted.

ORDER

Based on the foregoing, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1.  Defendant Midas Resources, Inc.'s motion for summary judgment [Docket No. 56] is GRANTED in part and DENIED in part;

2.  The motion is GRANTED with respect to plaintiff's claim of intentional infliction of emotional distress (Count 8 of Plaintiff's Complaint) [Docket No. 13, part 4], and this claim is hereby DISMISSED WITH PREJUDICE;

3.  The motion is DENIED in all other respects.

Dated: July 12, 2006                    s/Patrick J. Schiltz
                                        PATRICK J. SCHILTZ
                                        United States District Court Judge